UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SELSO PALMA ULLOA, *et al.*,

        Plaintiffs,

v.                                    Case No.  8:15-cv-2690-T-24 AAS

FANCY FARMS, INC.,

        Defendant.
_____/

## ORDER

    This case is before the Court on the parties' proposed findings of fact and conclusions of law.  (Doc. No. 93, 94).  The Court previously entered summary judgment in favor of Defendant Fancy Farms on Plaintiffs' Fair Labor Standards Act claim (Doc. No. 74), and the parties have stipulated that the Court can resolve Plaintiffs' remaining breach of contract claim based on the record before it (Doc. No. 83).

## I.  Factual Background

    The Court makes the following initial findings of fact.  Fancy Farms is a Florida corporation based in Hillsborough County, Florida that produces hand-harvested strawberries for commercial sale.  (Doc. 21, ¶7; Doc. 54-1, ¶1; Doc. 57, ¶1; Doc. 48, depo. p. 115; Doc. 54-1, ¶2; Doc. 57, ¶2).  To obtain a steady workforce for its strawberry operations, beginning with the 2013–14 strawberry season, Fancy Farms sought to employ workers through the H-2A temporary agricultural guestworker program. (Doc. 48, depo. p. 134–35; Doc. 54-1, ¶5; Doc. 57, ¶5).  To assist it in obtaining workers through the H-2A program, Fancy Farms hired Nestor Molina, a principal of All Nations Staffing, and his business partner, Patrick Burns, as employees on June 20, 2013.  (Doc. No. 51, ¶ 5).

At no time did Fancy Farms authorize Molina or Burns to request recruitment fees of prospective H-2A workers, or to accept recruitment payments from prospective workers.  (Doc. 51 at ¶7; Doc. 47 at ¶9; Doc. 58 at ¶9). Fancy Farms did not, however, *contractually* forbid Molina, Burns, or their agents from seeking or receiving recruitment fees from prospective workers, because Fancy Farms was not aware of any federal regulations requiring it to do so. (Doc. 14, ¶16; Doc. 21, ¶16; Doc. 48, depo. pp. 201, 208–09; Doc. 51, ¶7; Doc. 47, ¶11; Doc. 58, ¶11).

Fancy Farms submitted to the United States Department of Labor ("DOL") clearance orders, which served as the employment contracts between Plaintiffs and Fancy Farms.  (Doc. No. 89-2; Doc. No. 89-3).  Within these documents, Fancy Farms declared that it would comply with federal regulations, including 20 C.F.R. § 655.135, which required Fancy Farms to contractually forbid any foreign labor recruiter whom it engaged in international recruitment of H-2A workers to seek or receive payments from prospective employees.[1] (Doc. No. 89-2, P-174; Doc. No. 89-3, P-341)  Fancy Farms also specifically declared within these documents that it had contractually forbidden any recruiter that it had engaged in the international recruitment of H-2A applicants to seek or receive payments from prospective workers.  (Doc. No. 89-2, P-175; Doc. No. 89-3, P-342).

Plaintiffs contend that they paid recruitment fees of between $3,000 and $4,000 to

_____

[1]Among the regulations included in that section is 20 C.F.R. 655.135(k), which provides that the employer must make the following assurance: "The employer has contractually forbidden any foreign labor contractor or recruiter (or any agent of such foreign labor contractor or recruiter) whom the employer engages, either directly or indirectly, in international recruitment of H–2A workers to seek or receive payments or other compensation from prospective employees."

various agents of Molina as a condition of hire with Fancy Farms.[2]  (Doc. No. 68-12; Doc. No.

59-3; Doc. No. 59-1; Doc. No. 57-7; Doc. No. 90-4; Doc. No. 57-9; Doc. No. 57-10; Doc. No.

83-1; Doc. No. 57-12; Doc. No. 59-6; Doc. No. 59-8).  Fancy Farms was initially unaware of the

recruitment fees and did not reimburse Plaintiffs for any portion of the recruitment fees.[3]  (Doc.

No. 48, depo. p. 182–83).  As a result, Plaintiffs filed suit.

## II.  Procedural Background

Plaintiffs (54 foreign laborers who are citizens of Honduras) brought a breach of contract

claim based on Fancy Farms' breach of its obligation to contractually forbid All Nations

Staffing, Molina, Burns, and their agents[4] from seeking or receiving recruitment payments from

prospective employees.[5]  Plaintiffs contend that Fancy Farms' failure to abide by that

requirement constituted a breach of Fancy Farms' separate employment contracts (via the DOL

clearance orders) with Plaintiffs, which breach damaged Plaintiffs in the amount of the

---

[2]Fancy Farms disputes that Plaintiffs paid recruitment fees to Molina's agents, arguing that there is not sufficient evidence to connect the alleged agent-coordinators to Molina. However, as explained later in this Order, the Court finds that there is a sufficient connection between Molina and the coordinators to find that an agency relationship existed between Molina and the coordinators with respect to the payments made by the remaining plaintiffs at issue. (Doc. No. 68-12; Doc. No. 59-3; Doc. No. 59-1; Doc. No. 57-7; Doc. No. 90-4; Doc. No. 57-9; Doc. No. 57-10; Doc. No. 83-1; Doc. No. 57-12; Doc. No. 59-6; Doc. No. 59-8).

[3]Fancy Farms did not learn of the recruitment fees until it received a letter from Plaintiffs' counsel on March 6, 2014.  (Doc. No. 48, depo. p. 182–83; Doc. No. 17-5; Doc. No. 17-31).

[4]The breach of contract claim as stated in the Amended Complaint alleges that Fancy Farms failed to contractually forbid only All Nations Staffing and is silent as to Molina and Burns.  (Doc. No. 14).

[5]Plaintiffs also brought a claim under the Fair Labor Standards Act, but the Court previously granted Fancy Farms summary judgment on that claim.  (Doc. No. 74).

recruitment fees they had paid.

The Court granted summary judgment for Fancy Farms on Plaintiffs' breach of contract claim to the extent that any of the plaintiffs paid recruitment fees prior to June 20, 2013—the date that Fancy Farms entered into the recruitment contracts with Molina and Burns—because that was the date on which Fancy Farms should have contractually forbidden Molina, Burns, and their agents from seeking or receiving recruitment fees.  (Doc. No. 74).  However, it was not clear to the Court how that ruling specifically affected each of the 54 plaintiffs.  Thereafter, the parties filed a stipulation (Doc. No. 83) in which they agreed that the Court's summary judgment order resulted in barring the following 28 plaintiffs' breach of contract claims, because they paid their recruitment fees prior to June 20, 2013:

SELSO PALMA ULLOA
ORLIN NAHUM SANCHEZ HERNRIQUEZ
MANUEL EDGARDO MEJIA MENDEZ
NATAN JOEL ORELLANA MENDEZ
JORGE ALBERTO DOMINGUEZ MADRID
ERICK JOEL ULLOA AMAYA
BAYRON ALBERTO CHAVEZ MUNGUIA
DILIO CRUZ VASQUEZ
RENE ARDON VILLEDA
ALEX DANIEL ULLOA AMAYA
WILBER LISANDRO BENITEZ PORTILLO
JULIO CESAR SALMERON
RUFINO QUINTERO AMAYA
JOSE MELVIN VASQUEZ DOMINGUEZ
JONATAN FELIPE AMAYA BENITEZ
EVELIO HERNANDEZ AGUILAR

4

OSCAR AMILCA GUERRA

MARCO TULIO SANTOS GARCIA

NOEL ANTONIO DIAZ

GILBERTO MATIAS NOLASCO LOPEZ

MERLYN RAUL RODRIGUEZ AMAYA

EDUARDO ANTONIO CANO

SANTIAGO ARNALDO ORELLANA MENDEZ

JAIME ENRIQUE DOMINGUEZ MADRID

RENSO RENERIE CASTILLO BLANCO

ALEX CRUZ PONCE

JULIO CESAR RAMOS

ALEX RENE MEMBRENO REYES

Thus, based on the Court's summary judgment order and the parties' stipulation, only 26 plaintiffs' breach of contract claims remain.  Of those 26 plaintiffs, Plaintiffs concede in their proposed findings of fact and conclusions of law (Doc. No. 94, ¶ 19, 21, 22, 57) that the breach of contract claim for the following 15 plaintiffs fails due to lack of evidence to support their contention that they paid at least part of their recruitment fee after June 20, 2013 and/or lack of evidence regarding the amount of such recruitment fee that they paid after June 20, 2013:

DIONICIO MENCIA CHAVER

EDVIN PINEDA TINOCO

JOSE GUADALUPE HERNANDEZ ENAMORADO

MARVIN ALEXANDER BUEZO CABALLERO

ORLYN GERARDO CASTRO DIAZ

JOSE LUCIO ALVARADO DUBON

OSCAR DANILO LOPEZ VASQUEZ

5

DEBLIN OVIDIO LOPEZ HERNANDEZ

MANUEL DE JESUS HERNANDEZ AMAYA

JULIO CESAR GUTIERREZ

JORGE HUMBERTO VASQUEZ

RUBEN CASTRO CASTRO

CRISTIAN EDGARDO TINOCO BUESO

WALTER ANTONIO BRIZUELA GARCIA

WILMAN NOEL MARTINEZ LARA

Accordingly, only the following 11 plaintiffs' ("the Remaining Plaintiffs") breach of contract

claims remains for the Court's consideration:

OSMAN LEONEL GAMEZ RAMOS

GILBERTO GARCIA ZELAYA

FAREN OBED URRUTIA RAMIREZ

OSMON GERALDO GOMEZ

ELDER DOMINGO MADRID SAAVEDRA

OSCAR RENATO ANARIBA ULLOA

HENRY BLADIMIR ACOSTA RUIZ

CELSO LARA RODRIGUEZ

NERY JOEL CANO

MERLIN NOE ALVARADO MEDRANO

MARVIN ALEXANDER CASTRO ALVAREZ

## III.  Evidence Before the Court Regarding the 11 Remaining Plaintiffs

The 11 Remaining Plaintiffs submitted their Answers to Defendant's First Set of

Interrogatories, in which they describe who told them that they were required to pay a

recruitment fee, the amount of the recruitment fee they paid, and when and to whom they paid

the recruitment fee. (Doc. No. 68-12; Doc. No. 59-3; Doc. No. 59-1; Doc. No. 57-7; Doc. No.

90-4; Doc. No. 57-9; Doc. No. 57-10; Doc. No. 83-1; Doc. No. 57-12; Doc. No. 59-6; Doc. No.

59-8).  Additionally, every one of these plaintiffs stated that Molina told them that he would

return the recruitment fee to them.  (Doc. No. 68-12; Doc. No. 59-3; Doc. No. 59-1; Doc. No.

57-7; Doc. No. 90-4; Doc. No. 57-9; Doc. No. 57-10; Doc. No. 83-1; Doc. No. 57-12; Doc. No.

59-6; Doc. No. 59-8).  The following describes the evidence before the Court and the Court's

findings of fact and conclusions of law based on that evidence as to each of the Remaining

Plaintiffs.

**A.  Osman Leonel Gamez Ramos**

The following evidence is before the Court: Molina told Osman Leonel Gamez Ramos

that he was required to pay a $3,500 recruitment fee, and Molina gave him the account number

for depositing the recruitment fee.  (Doc. No. 68-12).  Osman Leonel Gamez Ramos paid a

$3,500 recruitment fee in or around August of 2013 by depositing the money into the bank

account.  (Doc. No. 68-12).

Based on the above, the Court makes the following findings of fact and conclusions of

law: Osman Leonel Gamez Ramos paid a $3,500 recruitment fee.  Molina told Osman Leonel

Gamez Ramos that he was required to pay a $3,500 recruitment fee.  Osman Leonel Gamez

Ramos deposited the $3,500 recruitment fee into the bank account identified by Molina in or

around August of 2013 as directed by Molina.

**B.  Faren Obed Urrutia Ramirez**

The following evidence is before the Court: Molina told Faren Obed Urrutia Ramirez that

he was required to pay a $3,500 recruitment fee.  (Doc. No. 59-1).  Molina told him to get the

instructions for paying the recruitment fee from Joel Eduardo Vanegas.  (Doc. No. 59-1).  Joel

Eduardo Vanegas told Faren Obed Urrutia Ramirez how to pay the recruitment fee, and Faren

Obed Urrutia Ramirez paid the $3,500 recruitment fee in two installments.  (Doc. No. 59-1).

Faren Obed Urrutia Ramirez paid the first installment by depositing $3,000 into Jaime Alberto

Medina Santos' bank account on September 21, 2013.  (Doc. No. 59-1). Faren Obed Urrutia

Ramirez paid the second installment by depositing $500 into Joel Eduardo Vanegas' bank

account in December 2013.  (Doc. No. 59-1).  Faren Obed Urrutia Ramirez identifies Jaime

Alberto Medina Santos and Joel Eduardo Vanegas as Molina's coordinators.

Based on the above, the Court makes the following findings of fact and conclusions of

law: Faren Obed Urrutia Ramirez paid a $3,500 recruitment fee.  Molina told Faren Obed Urrutia

Ramirez that he was required to pay a $3,500 recruitment fee.  Because Molina told him to get

the instructions for paying the recruitment fee from Joel Eduardo Vanegas, the Court finds that

Joel Eduardo Vanegas was acting as Molina's agent for that purpose.  Additionally, because Joel

Eduardo Vanegas told Faren Obed Urrutia Ramirez how to pay the recruitment fee, and because

Faren Obed Urrutia Ramirez paid part of the recruitment fee by depositing $3,000 into Jaime

Alberto Medina Santos' bank account, the Court finds that Jaime Alberto Medina Santos was

also acting as Molina's agent for the purpose of receiving recruitment fee payments.  Finally, the

Court finds that Faren Obed Urrutia Ramirez paid the $3,500 recruitment fee in two

installments—one in September and the other in December of 2013.

### C.  Henry Bladimir Acosta Ruiz

The following evidence is before the Court: Molina's coordinator, Jaime Alberto Medina

Santos, told Henry Bladimir Acosta Ruiz of the need to pay the recruitment fee.  (Doc. No. 83-

8

1).  As a result, Henry Bladimir Acosta Ruiz paid a $4,000 recruitment fee on October 25, 2013 by depositing the money into Jaime Alberto Medina Santos' bank account.  (Doc. No. 83-1).

Based on the above, the Court makes the following findings of fact and conclusions of law: Henry Bladimir Acosta Ruiz paid a $4,000 recruitment fee on October 25, 2013 by depositing the money into Jaime Alberto Medina Santos' bank account.  The Court has already found (and this evidence further confirms) that Jaime Alberto Medina Santos was acting as Molina's agent for the purpose of receiving the recruitment fee.

**D.  Osmon Geraldo Gomez**

The following evidence is before the Court: At a meeting where other workers attended, Molina and Eswin Cruz told Osmon Geraldo Gomez that he was required to pay a $3,500 recruitment fee.  (Doc. No. 57-7).  Osmon Geraldo Gomez paid the $3,500 recruitment fee in two installments in September 2013 and November 2013 by paying cash to Rolando Enamorado. (Doc. No. 57-7).  Osmon Geraldo Gomez states that Rolando Enamorado was Molina's coordinator.  (Doc. No. 57-7).

Based on the above, the Court makes the following findings of fact and conclusions of law: Osmon Geraldo Gomez paid a $3,500 recruitment fee by paying cash to Rolando Enamorado.  The Court finds that Rolando Enamorado was acting as Molina's agent for the purpose of receiving recruitment fee payments.  Osmon Geraldo Gomez paid the $3,500 recruitment in two installments–one in September 2013 and the second in November 2013.

**E.  Marvin Alexander Castro Alvarez**

The following evidence is before the Court: At a meeting, Eswin Cruz told Marvin

9

Alexander Castro Alvarez that he was required to pay a recruitment fee.  (Doc. No. 57-10).

Marvin Alexander Castro Alvarez paid a $3,500 recruitment fee in or around July of 2013 by

depositing the money into the bank account of Eswin Cruz.  (Doc. No. 57-10).  Marvin

Alexander Castro Alvarez states that Eswin Cruz was Molina's coordinator.  (Doc. No. 57-10).

One of the other plaintiffs in this case, Evelio Hernandez Aguilar, testified during his

deposition that Eswin Cruz was one of Molina's "workers."  (Doc. No. 62, depo. p. 29, 68–69,

78).  Aguilar testified that during a meeting, Molina told the people present that they would deal

with Eswin Cruz instead of with Molina directly.  (Doc. No. 62, depo. p. 56–57).

Based on the above, the Court makes the following findings of fact and conclusions of

law: Marvin Alexander Castro Alvarez paid a $3,500 recruitment fee in or around July of 2013

by depositing the money into the bank account of Eswin Cruz.  Eswin Cruz was acting as

Molina's agent for the purpose of directing the payment of the recruitment fee and for receiving

the payment of the recruitment fee.

### F.  Celso Lara Rodriguez

The following evidence is before the Court: Rolando Enamorado told Celso Lara

Rodriguez that he was required to pay a $3,500 recruitment fee.  (Doc. No. 57-12).  Celso Lara

Rodriguez describes Rolando Enamorado as one of Molina's coordinators.  Celso Lara

Rodriguez paid the $3,500 recruitment fee in or around September of 2013 by depositing the

money into Rolando Enamorado's bank account.  (Doc. No. 57-12).

Based on the above, the Court makes the following findings of fact and conclusions of

law: Celso Lara Rodriguez paid a $3,500 recruitment fee in or around September of 2013 by

depositing the money into Rolando Enamorado's bank account.  The Court has already found (and this evidence further confirms) that Rolando Enamorado was acting as Molina's agent for the purpose of receiving recruitment fee payments.

### G.  Merlin Noe Alvarado Medrano

The following evidence is before the Court: Molina told Merlin Noe Alvarado Medrano that he was required to pay a $3,500 recruitment fee.  (Doc. No. 59-8).  Merlin Noe Alvarado Medrano paid the $3,500 recruitment fee in cash to Edgardo Ulloa in or around August of 2013.  (Doc. No. 59-8).  Merlin Noe Alvarado Medrano states that Edgardo Ulloa was Molina's coordinator.  (Doc. No. 59-8).

One of the other plaintiffs in this case, Alex Daniel Ulloa Amaya, testified during his deposition that Edgardo Ulloa was one of Molina's coordinators.  (Doc. No. 63, depo. p. 26, 51, 70).  Amaya stated that coordinators, including Edgardo Ulloa, were in charge of recruiting people and that the workers seeking employment were divided among the coordinators.  (Doc. No. 63, depo. p. 26, 31–32, 69–70).  Amaya further stated that when a worker had a question about money, Molina told them to speak with their coordinator.  (Doc. No. 3, depo. p. 80–82).

Based on the above, the Court makes the following findings of fact and conclusions of law: Merlin Noe Alvarado Medrano paid a $3,500 recruitment fee to Edgardo Ulloa in or around August of 2013.  The Court finds that Edgardo Ulloa was acting as Molina's agent for the purpose of receiving recruitment fee payments.

### H.  Oscar Renato Anariba Ulloa

The following evidence is before the Court: At a meeting, Molina and Ulloa told Oscar

Renato Anariba Ulloa that he was required to pay a $3,500 recruitment fee.  (Doc. No. 57-9).

Oscar Renato Anariba Ulloa paid the $3,500 recruitment fee in cash to Ulloa in or around

September of 2013.  (Doc. No. 57-9).  Oscar Renato Anariba Ulloa describes Ulloa as one of

Molina's coordinators.  (Doc. No. 57-9).

Based on the above, the Court makes the following findings of fact and conclusions of

law: Oscar Renato Anariba Ulloa paid a $3,500 recruitment fee to Ulloa in or around September

of 2013.  The Court finds that Ulloa was acting as Molina's agent for the purpose of receiving

recruitment fee payments.

## I.  Gilberto Garcia Zelaya

The following evidence is before the Court: Molina's coordinator, Pedro Francisco Lino

Hernandez, told Gilberto Garcia Zelaya of the need to pay a $3,000 recruitment fee.  (Doc. No.

59-3).  Gilberto Garcia Zelaya paid the $3,000 recruitment fee on October 11, 2013 by

depositing the money into the bank account of Pedro Francisco Lino Hernandez's mother.  (Doc.

No. 59-3).  Gilberto Garcia Zelaya states that Molina had told him at a meeting on December 11,

2013 that he (Molina) would return the recruitment fee at the end of the farm contract. (Doc. No.

59-3).  However, when Gilberto Garcia Zelaya called Molina to get the recruitment fee back,

Molina responded that he would not return the money and that he (Zalaya) should be grateful

"because a coyote would charge more to bring [him] to the United States."  (Doc. No. 59-3, p.

9).

Based on the above, the Court makes the following findings of fact and conclusions of

law: Gilberto Garcia Zelaya paid the $3,000 recruitment fee on October 11, 2013 by depositing

the money into the bank account of Pedro Francisco Lino Hernandez's mother.  Because Molina

did not dispute that he had Gilberto Garcia Zelaya's money when he (Zelaya) asked for it to be

returned, and because Gilberto Garcia Zelaya identifies Pedro Francisco Lino Hernandez as

Molina's coordinator, the Court finds that the $3,000 recruitment fee is sufficiently connected to

Molina to be deemed paid to Molina.

### J.  Elder Domingo Madrid Saavedra

The following evidence is before the Court: One of Molina's coordinators, Juan Carlos

Fuentes, told Elder Domingo Madrid Saavedra  of the requirement to pay a $3,500 recruitment

fee.  (Doc. No. 90-4).  Elder Domingo Madrid Saavedra paid the $3,500 recruitment fee in two

installments in October of 2013 and December 2013 by depositing the money into two bank

accounts.  (Doc. No. 90-4).  Juan Carlos Fuentes was present when Elder Domingo Madrid

Saavedra made the deposits.  (Doc. No. 90-4).  Elder Domingo Madrid Saavedra gave the

deposit slips to Molina.  (Doc. No. 90-4).

Based on the above, the Court makes the following findings of fact and conclusions of

law: Elder Domingo Madrid Saavedra paid the $3,500 recruitment fee in two installments—one

in October of 2013 and December 2013.  Because Elder Domingo Madrid Saavedra gave the

deposit slips for these recruitment fee payments to Molina, the Court finds that Molina is

sufficiently connected to be deemed to have received the recruitment fee.

### K.  Nery Joel Cano

The following evidence is before the Court: Molina told Nery Joel Cano that he was

required to pay a $3,500 recruitment fee.  (Doc. No. 59-6).  Nery Joel Cano paid the $3,500

recruitment fee in cash in or around November of 2013 to a person that he describes as one of

Molina's coordinators.  (Doc. No. 59-6).  Nery Joel Cano will not identify the person that he

paid the recruitment fee to out of fear, because the alleged coordinator allegedly threatened his

family.  (Doc. No. 59-6).

Based on the above, the Court makes the following findings of fact and conclusions of

law: Nery Joel Cano paid a $3,500 recruitment fee in or around November of 2013.  Nery Joel

Cano paid the recruitment fee because Molina told him of the requirement to do so.  The Court

finds that Nery Joel Cano's payment of the recruitment fee is sufficiently connected to Molina to

be deemed to have been paid to Molina.

### L.  Conclusion

Based on the above, the Court finds that each of the Remaining Plaintiffs paid a

recruitment fee; that Molina or his agents directed the payment of the recruitment fee; and that

the recruitment fee was paid after June 20, 2013.  The Court further finds that the 11 Remaining

Plaintiffs have shown, by a preponderance of the evidence, that Molina or one of Molina's

agents received the recruitment fee.  Finally, the Court finds that Molina and his agents required

the 11 Remaining Plaintiffs to pay a recruitment fee solely for the opportunity to gain

employment.  (Doc. No. 57-21, depo. p. 9, 11; Doc. No. 63, depo. p. 72; Doc. No. 62, depo. p.

18, 80).

### IV.  Conclusions of Law

The 11 Remaining Plaintiffs have asserted a breach of contract claim against Fancy

Farms.  The Remaining Plaintiffs claim that Fancy Farms breached their employment contract by

failing to contractually forbid Molina, Burns, and their agents from seeking or receiving

14

recruitment fees and that the recruitment fees they paid are the resulting damages.

## A.  Availability of a Contractual Remedy

Whether Fancy Farms' failure to contractually forbid Molina, Burns, and their agents from seeking or receiving recruitment payments from prospective employees can support a viable breach of contract claim for damages in the form of the recruitment fees paid is an issue of first impression for this Court.  Neither party has cited any case law directly on point addressing whether a contractual remedy is available under these circumstances.  However, there are cases that "have held that H-2A workers may pursue state breach of contract claims against employers who fail to comply with clearance orders."  Lopez v. Fish, 2012 WL 2126856, at *2 (E.D. Tenn. May 21, 2012).

For example, in Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 895–96, 899 (9th Cir. 2013), the farmworker-plaintiffs filed suit against the farm-owner, and one of the claims they asserted was a breach of contract claim due to the farm-owner violating the terms of the DOL clearance orders.  The district court dismissed the breach of contract claim in the second amended complaint for being insufficiently pled.  See id. at 899.

The farm-workers had asserted in their second amended complaint that pursuant to 20 C.F.R. § 655.122(q), the contracts between themselves and the farm-owner were required to contain certain provisions, and the farm-owner's failure to comply with the mandatory terms was a breach of contract.  See id. at 900.  The farm-workers appealed, and in analyzing this claim, the appellate court stated the following:

Such  mandatory  terms  include  provisions  prohibiting  H–2A

15

> employers from "mak[ing] deductions that would violate the FLSA,"
> [20 C.F.R.] § 655.122(p), and requiring H–2A employers to "provide
> or pay for the worker's transportation and daily subsistence from the
> place of employment to the place from which the worker . . . departed
> to work for the employer," [20 C.F.R.] § 655.122(h)(2).  In light of
> these terms of the contract, the factual allegations incorporated into
> the breach of contract claim plausibly state a claim.  The district court
> erred in concluding that the farmworkers had not pled their breach of
> contract claims with sufficient specificity.

Id. at 900.  The appellate court went on to note that some of the farmworkers had been required

to pay a recruitment fee and that they were seeking reimbursement of such recruitment fees.  See

id. at 900 n.5.

Based on the above, it appears to this Court that a contractual remedy is available to

redress the alleged violation of the DOL clearance orders in the instant case.  This conclusion is

further supported by the DOL's H-2A regulations.

Specifically, the DOL's H-2A regulations express the intent and need to prohibit the

exploitation of foreign workers and provide the following:

> Examples of exploitation of foreign workers, who in some instances
> have been required to give recruiters thousands of dollars to secure
> a job, have been widely reported. The Department is concerned that
> workers who have heavily indebted themselves to secure a place in
> the H-2A program may be subject to exploitation in ways that would
> adversely affect the wages and working conditions of U.S. workers
> by creating conditions resembling those akin to indentured servitude,
> driving down wages and working conditions for all workers, foreign
> and domestic.
>
> *       *       *
>
> [T]he DHS Final H-2A Rule . . . precludes the approval of an H-2A
> petition, and provides for possible revocation of an already approved
> H-2A petition, if the employer knows or has reason to know that the
> worker has paid, or has agreed to pay fees to a recruiter or facilitator
> as a condition of gaining access to the H-2A program.

16

*       *       *

> The Department recognizes that its power to enforce regulations across international borders is constrained. However, it can and should do as much as possible in the U.S. to protect workers from unscrupulous recruiters. Consequently, the Department is requiring that the employer make, as a condition of applying for labor certification, and therefore, as a condition to lawful H-2A employment within the U.S., the commitment that the employer is contractually forbidding any foreign labor contractor or recruiter whom the employer engages in international recruitment of H-2A workers to seek or receive payments from prospective employees in exchange for access to job opportunities.

*       *       *

> While the Department cannot reach the conduct of foreign recruiters abroad, it can regulate the conduct of U.S. employers participating in the foreign labor certification process who do business with these recruiters. The Department cannot by regulation impose strict liability on employers for labor contractors' activities abroad, but the Department, as a condition for an employer to obtain approval of a temporary labor certification application, can require the employer to contractually forbid foreign recruiters that an employer uses as its agent from seeking or receiving payments from prospective employees . . . .

Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the

Labor Certification Process and Enforcement, 73 FR 77110-01, 2008 WL 5244078, at

*77159–60 (Dec. 18, 2008).

The DOL has clearly stated that it wants to prohibit the exploitation of foreign workers

by their being a charged recruitment fee for a job opportunity in the United States.  However, the

DOL's power to enforce its regulations outside of the United States is limited.  Therefore, in an

attempt to prohibit the exploitation of foreign workers given its limited international enforcement

power, the DOL requires United States employers to contractually forbid foreign recruiters from

seeking or receiving recruitment fees as a condition of employment.  As such, this Court

17

concludes that if a United States employer of H-2A foreign laborers does not contractually forbid the recruiters it hires from exploiting the foreign workers by charging recruiting fees, the United States employer can be held responsible for this failure.  Accordingly, Fancy Farms' failure to contractually forbid Molina, Burns, and their agents from seeking or receiving recruitment fees from prospective foreign labor employees can support a viable breach of contract claim for damages in the form of the recruitment fees paid.

### B.  Elements of the Breach of Contract Claim

While the Court has found that a contractual remedy is available, the Remaining Plaintiffs have the burden of proving their breach of contract claim by a preponderance of the evidence.  See Knowles v. C.I.T. Corp., 346 So.2d 1042, 1043 (Fla. 1st DCA 1977).  Under Florida law, the Remaining Plaintiffs must prove: (1) the existence of a contract, (2) a material breach, and (3) damages resulting from the breach.  See id.; Vega v. T-Mobile USA, Inc., 564 F.3d 1256, (11th Cir. 2009).

### 1.  Existence of a Contract

The Court finds that the Remaining Plaintiffs have proven the first element—existence of a contract.  There is no dispute that a contract exists between the 11 Remaining Plaintiffs and Fancy Farms via the DOL clearance orders.

### 2.  Material Breach

Next, the Court finds that the Remaining Plaintiffs have proven the second element—a material breach.  Fancy Farms was required to contractually forbid Molina, Burns, and their agents from seeking or receiving recruitment payments from prospective foreign labor

18

employees.  There is no dispute that Fancy Farms failed to fulfill this obligation, and the Court

finds that this failure resulted in a material breach.

### 3.  Damages Resulting from the Breach

The third element that the Remaining Plaintiffs must prove is damages resulting from the

breach.  "A party cannot recover damages for breach of contract unless it can prove that the

damages were proximately caused by the breach."  Crowley American Transport, Inc. v. Richard

Sewing Machine Co., 172 F.3d 781, 784 (11th Cir. 1999).  The 11 Remaining Plaintiffs contend

that they have proven this element by establishing that they paid a recruitment fee to, or at the

direction of, Molina or one of his agents for the opportunity of employment.

While the Court has found that the 11 Remaining Plaintiffs each paid their recruitment

fee after June 20, 2013—the date on which Fancy Farms should have contractually forbidden

Molina, Burns, and their agents from seeking or receiving recruitment fees from prospective

workers—and that they paid the recruitment fees to, or at the direction of, Molina or one of his

agents for the opportunity of employment, those findings are not sufficient to establish this

element.  The Remaining Plaintiffs must also show that their payments of the recruitment fees

were proximately caused by Fancy Farms' failure to contractually forbid Molina, Burns, and

their agents from seeking or receiving recruitment fees from prospective workers.  Stated

differently, the Remaining Plaintiffs must show, by a preponderance of the evidence, that had

Fancy Farms contractually forbidden Molina, Burns, and their agents from seeking or receiving

recruitment fees from prospective workers, Molina would not have charged the Remaining

Plaintiffs a recruitment fee.  The Remaining Plaintiffs have not made this showing by a

preponderance of the evidence.

19

The Remaining Plaintiffs failed to submit any evidence on this issue.  Instead, it appears that they ask the Court to simply assume that had Fancy Farms contractually forbidden Molina, Burns, and their agents from seeking or receiving recruitment fees from prospective workers, Molina would not have charged the Remaining Plaintiffs a recruitment fee.  However, the Court cannot simply make that assumption.  The United States federal regulations regarding the recruitment of foreign workers is quite clear that prospective foreign labor employees should not be charged a recruitment fee for the opportunity to work in the United States.  Since Molina was helping Fancy Farms to recruit foreign workers and complete the H2-A process, Molina should have known the applicable rules, including that he was prohibited from charging the prospective workers a recruitment fee for the opportunity to work in the United States.   However, the Court cannot make that assumption either.

Fancy Farms, on the other hand, argues that it has provided the Court with evidence that even if Fancy Farms had contractually forbidden Molina, Burns, and their agents from seeking recruitment fees, it would not have made a difference.  In support of this argument, Fancy Farms points out that it had recommended Molina's services to G & D Farms who also hired Molina to recruit foreign workers.  (Doc. No. 53, ¶ 3).  G & D Farms did contractually forbid Molina from seeking or receiving recruitment fees from foreign workers.  (Doc. No. 53, p. 9).  Fancy Farms contends that despite the contractual prohibition, Molina still sought recruitment fees from one foreign worker, Anthony A. Sierra Hernandez, who later filed a lawsuit against Molina in the Southern District of Florida regarding Molina's recruitment of workers for Fancy Farms and G

& D Farms.[6]

The fact that Anthony A. Sierra Hernandez filed suit against Molina is not proof that Molina charged him a recruitment fee.  Fancy Farms does not submit an affidavit from Anthony A. Sierra Hernandez stating that Molina charged him a recruitment fee or any other evidence short of the allegations in the Southern District of Florida complaint.  As such, the Court finds that Anthony A. Sierra Hernandez's lawsuit is not sufficient to prove that Molina would have charged the Remaining Plaintiffs a recruitment fee even if Fancy Farms had contractually forbidden him, Burns, and their agents from doing so.

Thus, the evidence before the Court does not weigh in favor of either side on the issue of causation.  Because the Remaining Plaintiffs have the burden of proving that their damages were proximately caused by the breach, the Court concludes that they have failed to establish this essential element of their breach of contract claim.

Therefore, while the Court has found that the Remaining Plaintiffs have proven the existence of a contract and a material breach by Fancy Farms, the Remaining Plaintiffs have not proven that the breach was the proximate cause of their damages.  As a result, the Court finds in favor of Fancy Farms on the breach of contract claim.

## V.  Other Arguments

Fancy Farms has asserted three other arguments in support of its contention that the Remaining Plaintiffs' breach of contract claim fails.  Although the Court has found that the

---

[6]Five plaintiffs from this case joined the lawsuit in the Southern District of Florida (case number 0:14-cv-61497-KMW).  That case was voluntarily dismissed less than two months after filing, because the plaintiffs were unable to serve Molina.

Remaining Plaintiffs' breach of contract claim fails for the above stated reasons, the Court will address Fancy Farms' remaining arguments.

Fancy Farms argues that the breach of contract claim fails for the following reasons: First, Fancy Farms argues there is no viable breach of contract claim for six of the Remaining Plaintiffs, because they learned of the requirement to pay the recruitment fee prior to June 20, 2013—the date on which Fancy Farms should have contractually forbidden Molina, Burns, and their agents from seeking or receiving recruitment fees from prospective workers.  Second, Fancy Farms argues there is no viable breach of contract claim because the Remaining Plaintiffs did not pay their recruitment fees directly to Molina or Burns.  Third, Fancy Farms argues that it cannot be held liable for Molina's act of seeking recruitment fees, because such conduct was not authorized by Fancy Farms.  For the reasons stated below, the Court rejects these arguments.

## A.  Requirement to Pay

Fancy Farms argues that the breach of contract claim fails for six of the Remaining Plaintiffs, because those plaintiffs learned of the requirement to pay the recruitment fee prior to June 20, 2013—the date on which Fancy Farms should have contractually forbidden Molina, Burns, and their agents from seeking or receiving recruitment fees from prospective foreign workers.  Specifically, Fancy Farms points out that the following plaintiffs first learned of the requirement to pay a recruitment fee prior to June 20, 2013: (1) Osman Leonel Gamez Ramos (Doc. No. 68-12), (2) Gilberto Garcia Zelaya (Doc. No. 59-3), (3) Marvin Alexander Castro Alvarez[7] (Doc. No. 57-10), (4) Henry Bladimir Acosta Ruiz (Doc. No. 83-1), (5) Nery Joel Cano

---

[7]Marvin Alexander Castro Alvarez learned of the recruitment fee on two occasions—once in June or July 2013 and a second time in July 2013.  (Doc. No. 57-10).

(Doc. No. 59-6), and (6) Merlin Noe Alvarado Medrano[8] (Doc. No. 59-8).

The Court rejects this argument because the Court has found and it is undisputed that all six of these Remaining Plaintiffs paid their recruitment fees after June 20, 2013.  The fact that these six Remaining Plaintiffs may have learned of the requirement to pay the recruitment fee prior to June 20, 2013 is not dispositive, because all six of these Remaining Plaintiffs paid their recruitment fees after June 20, 2013.  The regulation contained in 20 C.F.R. 655.135(k) requires that Fancy Farms contractually forbid Molina from *seeking or receiving* payments or other compensation from prospective employees.  While Molina may have sought payments prior to June 20, 2013, the Court has found that he received recruitment fees from these six Remaining Plaintiffs after June 20, 2013.  Accordingly, the Court rejects Fancy Farms' argument that the breach of contract claim fails for these six plaintiffs because they learned of the requirement to pay the recruitment fee prior to June 20, 2013.

### B.  Payment of the Recruitment Fee

Next, Fancy Farms argues that the breach of contract claim fails because the Remaining Plaintiffs did not pay their recruitment fees directly to Molina or Burns.  Instead, they paid their recruitment fees in cash to third parties or deposited money into a third party's bank account. However, pursuant to 29 C.F.R. § 655.135(k), Fancy Farms was required to contractually prohibit Molina, Burns, and their agents from seeking or receiving a recruitment fee.  The Court has already found that Molina or one of his agent coordinators directed the Remaining Plaintiffs to pay the recruitment fee and that the receipt of the payments can be connected to Molina or one

---

[8]Merlin Noe Alvarado Medrano learned of the recruitment fee on two occasions—once in June 2013 and a second time in August 2013.  (Doc. No. 59-8).

of his agents.  Therefore, the Court rejects Fancy Farms' argument that the breach of contract claim fails because these plaintiffs paid their recruitment fees to third parties.

### C.  Authorization

Next, Fancy Farms argues it cannot be held liable for Molina's act of seeking or receiving recruitment fees, because such conduct was not authorized by Fancy Farms.  In support of this argument, Fancy Farms cites to the decision in Arriaga v. Florida Pacific Farms, L.L.C., 305 F.3d 1228 (11th Cir. 2002).

In Arriaga, the plaintiff farm workers asserted a Fair Labor Standards Act ("FLSA") claim that sought, in part, reimbursement for recruitment fees that they had paid.  See id. at 1231. The court concluded that the plaintiffs were not entitled to reimbursement of the recruitment fees they had paid, because the defendant farms did not give their agents authority to charge the recruitment fees.  See id. at 1245–46.

However, in the instant case, the Remaining Plaintiffs are now proceeding on a breach of contract claim, not an FLSA claim, so Arriaga is distinguishable.  Fancy Farms also points to Ramos-Barrientos v. Bland Farms, LLC, 661 F.3d 587 (11th Cir. 2011), as a case that analyzes FLSA claims, as well as breach of contract claims, regarding recruitment fees.[9]  However, as explained below, Ramos-Barrientos is distinguishable.

In Ramos-Barrientos, the court addressed whether the plaintiff farm workers were entitled to reimbursement for the recruitment fees that they had paid.  See id. at 600.  In the

---

[9]Fancy Farms also cites to a case related to Ramos-Barrientos; specifically, Ojeda-Sanchez v. Bland Farms, LLC, 2010 WL 3282984 (S.D. Ga. Aug. 18, 2010).

24

section of the opinion addressing their claim regarding the recruitment fees, the court stated that the plaintiffs were arguing that they were entitled to reimbursement under the FLSA. <u>See</u> <u>id.</u> The court then went on to analyze whether the defendant farm gave its agents authority to charge the recruitment fee and found that there was no authority. <u>See</u> <u>id.</u> at 600–02. As a result, the court found that the defendant farm was not required to reimburse the plaintiffs for the recruitment fees. <u>See</u> <u>id.</u>

This Court finds <u>Ramos-Barrientos</u> distinguishable for two reasons. First, the plaintiffs in that case did not assert a breach of contract claim with the breach consisting of the failure of the defendant farm to contractually forbid the recruiter and its affiliates from charging a recruitment fee. While the <u>Ramos-Barrientos</u> plaintiffs did point out that the farms failed to include a contractual prohibition on its recruiters' agents, the plaintiffs' breach of contract claim identified the breach as the failure to pay all wages due, including reimbursement of expenses. <u>See</u> <u>id.</u> at 593. Second, and more importantly, it appears that the recruitment fees in <u>Ramos-Barrientos</u> were payment for assisting the plaintiffs at the consulate in completing their visa application paperwork. <u>See</u> <u>id.</u> at 593, 601. However, in the instant case, the recruitment fees were paid solely for the opportunity to gain employment, as the workers were told that they were required to pay it. (Doc. No. 57-21, depo. p. 9, 11; Doc. No. 63, depo. p. 72; Doc. No. 62, depo. p. 18, 80).

The federal regulations explain that requiring the payment of a recruitment fee as a condition for access to a job is prohibited: "[T]he employer must contractually prohibit its foreign labor recruiters and their agents from charging or receiving such fees. In other words, paying such fees cannot be made a condition of access to the job." Temporary Agricultural

Employment of H-2A Aliens in the United States, 75 FR 6884-01, 2010WL 471437, at *6926

(Feb. 12, 2010).  Furthermore, the DOL has stated the following in Field Assistance Bulletin

2011-2:

> Contractually forbidding an agent, foreign labor contractor, or recruiter . . . from charging fees to workers for obtaining the job may not shield the employer from potential liability. If it is determined that the employer knew or reasonably should have known that the H-2A worker paid or agreed to pay a prohibited fee . . . to a foreign labor contractor or recruiter, the employer can still be in violation of 20 C.F.R. § 655.135(j).[10]
>
>        *       *       *
>
> Violations of the assurances in 20 C.F.R. § 655.135(j) and (k) are subject to the full range of sanctions and remedies discussed in 29 C.F.R. § 501.16, including but not limited to assessment of civil money penalties and recovery of unpaid wages. Note that this includes recovery of recruitment fees paid in the absence of contract clauses required by 20 C.F.R. § 655.135(k).

2010 WL 13063107 (May 6, 2011).[11]  Additionally, 29 C.F.R. § 501.16 provides that whenever

the Wage and Hour Division Administrator believes a violation of 20 C.F.R. § 655.135(j) has

occurred, it can institute appropriate administrative proceedings to recover recruitment fees paid

in the absence of required contract prohibition clauses.

The above persuasive guidance leads the Court to conclude that the analysis set forth in

Arriaga and Ramos-Barrientos—that the court looks at whether the defendant farm gave the

recruiter authority to charge the recruitment fees—is inapplicable to the Remaining Plaintiffs'

---

[10]The Court notes that 20 C.F.R. § 655.135(j) provides that an employer must make the following assurance in its H-2A application: "The employer and its agents have not sought or received payment of any kind from any employee subject to 8 U.S.C. 1188 for any activity related to obtaining H–2A labor certification, including payment of . . . recruitment costs."

[11]This Field Assistance Bulletin can be found at Doc. No. 57-23.

breach of contract claim.  Instead, the federal regulations and the DOL Field Assistance Bulletin show that a failure to contractually forbid recruitment fees is a violation that can result in a penalty against the employer.  It follows then that a foreign laborer may bring a breach of contract claim to recover recruitment fees paid when the employer fails to contractually forbid the recruiter from charging recruitment fees.

The Court rejects Fancy Farms' argument that it cannot be held liable for Molina's act of seeking recruitment fees solely because such conduct was not authorized by Fancy Farms. Fancy Farms could have been held liable for its own failure to contractually forbid Molina, Burns, and their agents from seeking or receiving such fees if the Remaining Plaintiffs had proven that Fancy Farms' failure had proximately caused their damages.

## VI.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that the Clerk is directed to enter judgment in favor of Defendant Fancy Farms on both Counts I and II of the amended complaint. Thereafter, the Clerk is directed to **CLOSE** this case.

**DONE AND ORDERED** at Tampa, Florida, this 9th day of January, 2018.

Copies to:
Counsel of Record

SUSAN C. BUCKLEW
United States District Judge